DEPARTMENT OF NATURAL RESOURCES v BAYSHORE
ASSOCIATES, INC

Docket No. 137980. Submitted September 15, 1994, at. Detroit. Decided April 21, 1995, at 9:50 A.M.

The Department of Natural Resources brought an action in the St. Clair Circuit Court against Bayshore Associates, Inc., seeking an injunction against alleged violations of the Inland Lakes and Streams Act, MCL 281.951 *et seq.*; MSA 11.475(1) *et seq.,* by the defendant in its operation of a marina. The plaintiff had denied a construction permit for an expansion of the marina after determining that the proposed expansion would not be in compliance with the plaintiff's requirement that the fairway width be at least 1.5 times the length of the dock. The plaintiff also had initiated administrative proceedings for the revocation of the defendant's operating permit. The defendant counterclaimed for declaratory and injunctive relief from the denial of the construction permit and the nonrenewal or revocation of the operating permit. The court, James T. Corden, J., granted summary disposition for the defendant and ordered the plaintiff to pay the defendant's costs and attorney fees as sanctions for the plaintiff's frivolous action. The plaintiff appealed.

The Court of Appeals *held:*

1. The trial court harmlessly erred in finding that the Inland Lakes and Streams Act does not require operating permits for marinas. MCL 281.953(c); MSA 11.475(3)(c) provides that a person may not operate a marina without a permit issued by the plaintiff, and MCL 281.958; MSA 11.475(8) provides that such a permit is effective until revoked for cause or until its expiration and that the permit is subject to renewal.

2. The trial court correctly concluded that the plailntiff had failed to promulgate rules pursuant to the Administrative Procedures Act, MCL 24.201 *et seq.*; MSA 3.560(101) *et seq.,* for the renewal of operating permits and that the defendant's operating permit should have been renewed in the absence of such rules.

3. The trial court erred in ruling that there were no genuine

R<span>EFERENCES</span>
Am Jur 2d, Administrative Law § 154.
See ALR Index under Administrative Law.

issues of fact concerning whether the defendant could dredge canal C at the marina and concerning the reasonable use of the canal. The trial court should have conducted an evidentiary hearing in light of a stipulation by the parties to submit those disputed issues for resolution by the trial court. On remand, the trial court must conduct an evidentiary hearing.

4. The trial court correctly determined that the fairway width requirement was not enforceable because it had not been promulgated as a rule pursuant to the Administrative Procedures Act.

5. The trial court properly imposed sanctions on the plaintiff pursuant to MCR 2.114(F), which provides that a party pleading a frivolous claim may be ordered to pay the opposing party's costs, and MCL 600.2591; MSA 27A.2591, which provides that the trial court may order a party to pay the opposing party's costs and attorney fees where the party's action was frivolous and the primary purpose in initiating the action was to harass, embarrass, or injure the prevailing party.

6. The trial court did not abuse its discretion in rejecting as unreasonable some of the plaintiff's discovery requests relating to the award of costs and attorney fees to the defendant.

7. The trial court's use of a binder provided by the defendant did not violate MCR 2.107(A)(1), which requires that every party must be served with a copy of every paper or pleading filed in an action. The plaintiff received copies of all papers and pleadings filed by the defendant.

Affirmed in part, reversed in part, and remanded.

ADMINISTRATIVE LAW — RULES — ADMINISTRATIVE PROCEDURES ACT.

An agency regulation, standard, or instruction of general applicability that implements or applies law enforced or administered by the agency is not enforceable if it is not promulgated properly as a rule pursuant to the Administrative Procedures Act (MCL 24.207; MSA 3.560[107]).

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, and *Thomas J. Emery* and *Stephen F. Shuesler,* Assistant Attorneys General, for the plaintiff.

*Tindall & Associates, P.C.* (by *Michael E. Tindall* and *Judith R. Weinstein*), *O'Sullivan Beauchamp Kelly & Whipple* (by *David C. Whipple*), and

*Miller Johnson Snell & Cummiskey* (by *David J. Haywood*), for the defendants.

Amicus Curiae:

*Mark A. Cooley,* for Michigan United Conservation Clubs.

Before: SAWYER, P.J., and FITZGERALD and T. S. EVELAND,* JJ.

PER CURIAM. The Department of Natural Resources appeals from an order of the circuit court granting declaratory judgment in favor of defendant. We affirm in part, reverse in part, and remand.

This case involves a dispute over a marina owned and operated by defendant Bayshore Associates, Inc., and compliance with the Inland Lakes and Streams Act (ILSA), MCL 281.951 *et seq.*; MSA 11.475(1) *et seq.* This dispute has involved extensive litigation and administrative action. In this case, the DNR charitably may be described as an agency zealously enforcing the environmental laws under its jurisdiction. Its conduct may be described less charitably as that of a rogue agency wielding its extensive power to punish and harass a landowner for daring to insist on and asserting its constitutional and statutory rights.

Bayshore purchased the marina in question in 1987. The marina is located on Swan Creek, a tributary of Lake St. Clair. The DNR had originally issued a marina operating permit to the facility in 1971, allowing the use of 303 boat slips. The slips were located along three canals, designated A, B, and C. The C canal is shared with other riparian

---

* Circuit judge, sitting on the Court of Appeals by assignment.

landowners, with Bayshore's docks located along the north side of that canal.

In September 1986, Bayshore sought a DNR construction permit to allow it to allow them to expand the marina to 369 docks, dredge the canals, add a seawall, and pave the parking lot. The DNR held a public hearing on the matter in April 1987 and, on December 10, 1987, a DNR water-quality specialist denied the construction permit in an opinion letter. The DNR noted that safe marina standards recognized by the DNR required a minimum fairway width of 1.5 times the dock length to ensure safe navigation,[1] and concluded that the placement of Bayshore's proposed piers did not meet this standard. The water-quality specialist further concluded that a permit could be issued for dredging and for construction of a seawall provided that the existing fairway widths were increased to comply with the 1.5 rule, with no docking along the C canal. As a result of the denial of the construction permit, Bayshore operated the marina under the original operating permit, which had been reissued under Bayshore's name on March 13, 1987. The permit had an expiration date of December 31, 1989.

Litigation began on March 22, 1988, when the St. Clair County prosecutor filed a complaint against Bayshore and its president seeking to enjoin Bayshore from conducting activities in violation of § 3 of the ILSA, MCL 281.953; MSA 11.475(3). The complaint was supported by the affidavit of the DNR water-quality specialist, Steven Spencer, who stated that Bayshore was operating the marina contrary to the terms and conditions of the current operating permit by expanding its facilities without a construction permit. The affida-

---

[1] This is known as the "1.5 rule."

vit alleged that Bayshore was dredging, removing structures, and constructing new structures to expand the marina in violation of the ILSA. The trial court issued a temporary restraining order.

After the temporary restraining order was issued, the parties entered into a consent agreement and order dissolving the temporary restraining order. Under the consent order, Bayshore agreed not to exceed 303 boat slips as listed under the original operating permit, to allow Spencer to inspect the marina, and to submit an after-the-fact permit application covering any modifications or other construction that had not been grandfathered in under the original permit or otherwise exempted by statute. Bayshore, however, never submitted an after-the-fact permit application, asserting that no dredging, modifications, or otherwise nonexempt construction had ever been performed contrary to the ILSA or its operating permit. Bayshore has consistently argued that it did not change the configuration of the marina and that any construction performed was maintenance work that was exempt from permit requirements under § 4(j) of the ILSA, MCL 281.954(j); MSA 11.475(4)(j). At the conclusion of this litigation, the trial court determined that Spencer's affidavit alleging violations of the ILSA had no basis in fact or law. In any event, despite entry of the consent order dissolving the temporary restraining order, the controversy between the DNR and Bayshore continued.

On May 2, 1988, Bayshore filed a countercomplaint against the DNR seeking declaratory and injunctive relief. Bayshore alleged that the DNR had abused its discretion and regulatory authority by failing to act on its application for a construction permit and by demanding an increase in fairway widths under the 1.5 rule. Bayshore fur-

ther alleged that the terms and conditions added to the construction permit were illegal and unauthorized under the ILSA. Bayshore also alleged that Steven Spencer had submitted a false affidavit in support of the original complaint and that Spencer and another DNR employee, Thomas Bennett, had wilfully attempted to coerce Bayshore into submitting to the DNR's illegal demands. Subsequently, Bayshore filed an amended countercomplaint that sought a declaratory judgment that the DNR review and a permit were not needed to perform regular maintenance and repair work, that the ILSA and administrative rules did not support the conditions placed upon Bayshore's construction permit, and that the DNR exceeded its authority in denying Bayshore a dredging permit. Bayshore asked the court to enjoin the DNR's administrative proceedings concerning the revocation of its operating permit, to order the DNR to grant a construction permit without the bond requirement, and to order the DNR to permit the requested dredging.

The above-mentioned dredging permits and administrative hearing arose from an August 1988 application by Bayshore to the DNR and the Army Corps of Engineers for permits to dredge the marina. The corps of engineers granted the request. However, Chris Schaefer, chief of the DNR Great Lakes Shorelands Section, refused to process the permit request. In a December 22, 1988, letter, he stated that the permit could not be processed because of the pending litigation and existing violations at the marina. Schaefer cited unspecified, unauthorized structures in noncompliance and wrote that Bayshore's dredging application would be held in abeyance until the circuit court resolved the issues or the marina was brought into compliance.

Bayshore received a second letter from Schaefer,

dated December 22, 1988, wherein Schaefer ordered it to appear for an administrative hearing on January 19, 1989, to show cause why Bayshore's marina operating permit should not be revoked. The letter noted that the DNR was in litigation with Bayshore over unauthorized construction work at the marina and stated that "[r]eview of the unauthorized work showed that a majority of the docks at the facility do not meet minimum fairway standards for safe navigation or satisfy marina operating permit criteria for issuance of a permit." The hearing was held before the DNR's acting chief of environmental enforcement, John Shauver. Shauver issued his decision in an opinion letter dated February 16, 1989, in which he noted that the DNR's 1.5 rule was not promulgated as a rule, but was merely a guideline used by DNR staff to recommend to persons and entities subject to its regulation. Shauver concluded that Bayshore had proven compliance with its operating permit as it pertained to the allegations in the December 22, 1988, notice letter. The DNR did not appeal or otherwise challenge Shauver's determination.

However, despite the administrative decision, on February 27, 1989, a stipulated order was entered agreeing to have the trial court determine the validity of the 1.5 rule through an evidentiary hearing. The stipulated order provided that Bayshore would be allowed to conduct dredging of the A and B canals and a limited portion of the C canal. The order further provided that the parties agreed that the only remaining issues to be determined were whether Bayshore could perform maintenance dredging on the C canal and the reasonable use of the C canal.

The trial court determined that the validity of the 1.5 rule and its applicability to Bayshore were

questions of law and directed the parties to submit briefs. Ultimately, the court found that the 1.5-fairway-width rule was neither a rule nor a guideline under the Administrative Procedures Act (APA), MCL 24.201 *et seq.*; MSA 3.560(101) *et seq.*, and that the DNR could not revoke or withhold the permit on the basis of this unpromulgated standard. In short, the 1.5 rule was of no force or effect with regard to the operation or construction of Bayshore's marina.

Despite the stipulated order to have the trial court determine the validity of the 1.5 rule, the parties still disagreed about the processing of the August 1988 dredging permits. Bayshore moved to require the DNR to obey the terms of the ILSA regarding the processing of permits and to require the DNR to finally process the August 1988 dredging permit applications. On January 4, 1990, the trial court ordered the DNR to process Bayshore's permit applications in accordance with the ILSA. In May of 1990, Bayshore moved to enforce the January 4 order, arguing that the DNR still had not processed the applications. The DNR maintained that it had issued the permits requested. Bayshore argued that the dredging permits issued by the DNR were not responsive to its applications, because they neither granted nor denied the requested dredging, but instead permitted dredging that was insufficient to meet Bayshore's needs and did not cover the areas requested. The trial court found that the DNR had violated the January 4 order by failing to process the permit applications as required.

To further complicate matters, difficulties arose between the parties concerning discovery. In June 1989, Bayshore subpoenaed a DNR employee, Claude Schmidt, for the purpose of taking his deposition. Schmidt had been involved in the origi-

nal granting of the marina operating permit. However, the Assistant Attorney General representing the DNR originally refused to accept service of process of the subpoena and did not produce Schmidt for the original deposition date. A second subpoena was served to depose Schmidt, and the DNR moved for a protective order after the deposition date. Bayshore moved to compel deposition of Schmidt, and, following a hearing, the trial court ordered the DNR to produce Schmidt for deposition, granting Bayshore's motion for costs.

In May 1990, Bayshore sought to depose DNR employees Jack Bails, Chris Schaefer, and Thomas Bennett. Subpoenas were served, as well as requests for production of various documents. The DNR did not present the employees for deposition or produce the requested documents. Instead, it sought a protective order and moved to quash the subpoenas. Following a hearing, the trial court denied the motion for a protective order and directed the DNR to produce the witnesses for deposition and to produce the requested documents. The court further provided that any documents that the DNR refused to produce on the basis of privilege were to be produced for the court to examine at a subsequent hearing.

By way of complying with the request for the production of documents, the DNR's counsel informed Bayshore's counsel that there were over 1,200 files that potentially contained relevant documents and that counsel was free to review those files. The DNR, however, refused to sort through the files to find those that were relevant to the document-production request. However, following summary disposition for Bayshore, it was revealed that the statements by the DNR were untrue. In fact, the DNR's data-processing system allowed it to distinguish the files easily by computer, allowing it

to produce exactly the files that were requested. Furthermore, it was shown that the DNR failed to produce a memorandum by Schaefer explaining the 1.5 rule and its rationale, which was clearly within the parameters of the request for production.

Further acrimony was demonstrated at the deposition of Bails, where counsel for the DNR terminated the deposition after thirty minutes by leaving with the witnesses. Bayshore's counsel never questioned the witnesses.[2] Because of the denial of discovery, Bayshore moved to hold the DNR and the witnesses in contempt. Following a hearing, the trial court reserved decision on the issue and the contempt motion was ultimately withdrawn following the grant of summary disposition.

The antagonism between the parties further increased in 1990 when, on April 13, Bayshore's counsel received a letter dated March 30, 1990, from the DNR indicating that Bayshore's marina operating permit had expired on December 31, 1989, and that Bayshore was violating the ILSA by operating the marina without a permit. The letter further stated that Bayshore had seven days from the date of the letter to submit an application to renew the permit. Bayshore immediately mailed the renewal application by certified mail. The return receipt shows that the application was

---

[2] The DNR claims that the deposition was terminated because of an alleged ethnic slur by Bayshore's counsel, in which counsel used the term "Mexican standoff" to refer to a stalemate or impasse. However, a review of the short deposition transcript shows antagonistic and obstructive behavior by the DNR's counsel and her witnesses. Counsel had been obstreperous concerning the availability of witnesses at the deposition and then proceeded to deny the availability or existence of requested documents. Furthermore, the initial DNR witness and counsel both made several insulting references to "snotty" behavior by Bayshore's counsel before the "Mexican standoff" remark. Following the remarks, counsel and witnesses expressed indignation and stormed out of the deposition.

received by the DNR on April 19, 1990, six days later.

On May 2, 1990, the DNR moved for summary disposition of Bayshore's claims, arguing that there was no issue of fact because Bayshore no longer had a valid marina operating permit. The DNR submitted an affidavit that stated that Bayshore had been given written notice on March 30 that a permit renewal application was required within seven days and that one was not received until April 23.

The trial court found that it could not accept the DNR's arguments and denied the motion for summary disposition. The trial court found that the DNR had failed to provide defendant with due process in acting upon the renewal application and that the DNR had insufficient rules regarding the renewal of operating permits. The trial court further found that the notice letter relied upon deadlines that had no basis in the ILSA or rules and that even if the DNR had acted properly, Bayshore's application was filed within the deadline. Accordingly, the trial court granted declaratory judgment in favor of Bayshore.

At the same time that Bayshore moved for declaratory judgment, it also moved for summary disposition and for costs and attorney fees from March of 1988. The trial court found that the issues raised by the DNR's original complaint had been resolved by the court and, therefore, Bayshore was entitled to summary disposition. The court further noted that the DNR's February 16, 1989, administrative decision had resolved the issues raised in the DNR's December 22, 1988, letters and that declaratory judgments had already been entered regarding those issues. With respect to defendant's request for sanctions, the trial court noted that the initial temporary re-

straining order had been set aside within a matter of days and that the March 22, 1988, consent order should have terminated any further proceedings. Instead, the DNR was unsatisfied and began administrative proceedings against Bayshore. When the DNR's hearing officer found no violations by Bayshore, the DNR ignored its own administrative ruling and attempted to enforce the rules that had no basis in law. The trial court characterized the DNR's acts as the unrestricted exercise of governmental power and found rampant discovery abuses by the DNR, with subpoenas ignored and documents not produced according to court order. The trial court stated that overall it was dissatisfied[3] with the way DNR's counsel was handling the case, which proved oppressive to Bayshore. The trial court concluded that there was no reasonable basis for the DNR's pursuit of the litigation and that the DNR's positions lacked arguable legal merit. The trial court directed Bayshore's counsel to submit a bill of particulars.

Bayshore's counsel submitted a detailed bill of particulars requesting approximately $350,000 in attorney fees. In response, the DNR filed extensive interrogatories, requesting such relevant information as birth dates, social security numbers, employment histories, as well as all documents produced by the lawyers in relation to their representation of Bayshore, even in unrelated matters, as well as documents listing every client account for each law firm involved. In response to Bayshore's request for a protective order, the trial court noted that many of the items requested by the DNR were out of line and requested inappropriate information. In fact, the trial court noted that the only appropriate information requested by the DNR was

---

[3] Though angry and frustrated may be a more appropriate characterization.

already to be found in the bill of particulars. Accordingly, the trial court struck the interrogatories and granted a protective order against further discovery. Ultimately, the trial court awarded costs of $22,859.74 plus attorney fees in the amount of $193,695, for a total of $216,554.74. We turn now to the first issue.

Plaintiff first argues that the trial court erred in finding that the ILSA does not require a marina operating permit. We agree. Section 3(c) of the ILSA, MCL 281.953(c); MSA 11.475(3)(c), explicitly provides that a person may not operate a marina without a permit issued by the DNR. MCL 281.958; MSA 11.475(8) further provides that a permit is effective until revoked for cause but not beyond its term and may be subject to renewal. Clearly then, the ILSA requires a marina operating permit and authorizes the DNR to issue such permits.

However, resolution of this issue does not by itself require reversal of the trial court's ruling. The trial court further found that the DNR had not adequately promulgated rules governing the renewal of marina operating permits. We agree. Section 7 of the APA, MCL 24.207; MSA 3.560(107), defines an administrative rule as follows:

"Rule" means an agency regulation, statement, standard, policy, ruling, or instruction of general applicability that implements or applies law enforced or administered by the agency, or that prescribes the organization, procedure, or practice of the agency.

Further, § 11(1) of the ILSA, MCL 281.961(1); MSA 11.475(11)(1), states: "[T]he commission [Natural Resources Commission] may promulgate and enforce rules to implement this act [the ILSA] in accordance with and subject to [the APA]."

The rules promulgated by the DNR, 1979 AC, R 281.811 through R 281.846, indicate that they are clearly designed for review of permits for new marina construction, rather than for renewal of existing operating permits. That is, they establish the framework in which to analyze the propriety of issuing a permit for new construction that would disturb the status quo rather than establishing criteria that would be reviewed in the case of an existing facility. The DNR lacked properly promulgated rules governing the renewal of marina operating permits, and apparently processed renewals on an ad hoc basis, renewing permits as a matter of course where no changes were indicated on the renewal application.[4]

This lack of properly promulgated procedural rules does not provide due process, as the instant case illustrates. The trial court properly concluded that the DNR and the Natural Resources Commission had not properly promulgated adequate rules for renewal of operating permits as required under the APA. Accordingly, there was no basis under the rules for the department to have denied a renewal of the existing operating permit. That is, absent adequately promulgated rules governing the renewal of existing permits, we conclude that the department was obligated to renew a marina operating permit and could exercise its authority only where there was an application for an operating permit to create a new or expanded marina that would require additional construction, disturbing the status quo. Therefore, although the trial court did err in concluding that the ILSA did not require the issuance of marina operating permits, because we agree with the trial court that plaintiff had failed to promulgate properly rules governing the renewal of those permits, a renewal permit should

---

[4] Except, of course, in the instant case.

have been issued, and, therefore, the trial court's erroneous conclusion that no permit was required is harmless.

Plaintiff next argues that the trial court erred in concluding that there was no genuine issue of material fact concerning whether defendant could dredge the so-called C canal and what was the reasonable use of the C canal. While we would tend to conclude that no genuine issue remained following the February 16, 1989, administrative decision in favor of Bayshore with regard to the alleged violations discussed in the department's December 1988 letter, the issue of Bayshore's use of the C canal was revived and injected into the circuit court proceedings through the February 27, 1989, stipulated order. The stipulated order stated that the reasonable use of the C canal was a factual issue to be decided by the trial judge. Because the parties stipulated the existence of a factual issue, it was erroneous for the trial court to decide that no factual issue actually existed. Accordingly, the trial court should have held an evidentiary hearing regarding this issue.

Plaintiff next argues that the trial court erred in concluding that the department's "1.5 rule" concerning the width requirements of fairways in the marina was an improperly promulgated rule. We disagree. The DNR has not promulgated a rule requiring that fairway widths be 1.5 times the dock length. Rather, the DNR argues that that is merely a guideline to be used by DNR staff in reviewing permit applications. However, § 7 of the APA, MCL 24.207; MSA 3.560(107), as quoted above, indicates that a rule includes any regulation or standard or instruction of general applicability that implements or applies the law. Simply put, an administrative agency cannot rely upon a guideline or unpromulgated policies in lieu of

rules promulgated under the APA. See *Spruytte v Owens,* 190 Mich App 127, 133; 475 NW2d 382 (1991). Therefore, if the DNR wishes to make use of the so-called 1.5 rule in assessing marina operating permits, it is obligated to promulgate it as an actual rule in compliance with the APA. Accordingly, the trial court properly concluded that the 1.5 rule was an improperly promulgated rule and, therefore, unenforceable.

Next, plaintiff argues that the trial court erred in requiring the state to pay sanctions to defense counsel as a condition precedent to taking an appeal of the order requiring the payment of sanctions. This issue, however, is moot because the state has already paid the money required and has not been denied its right to seek appeal. In short, there is no effective remedy that this Court could fashion.

Plaintiff next argues that the trial court erred in awarding sanctions to defendant in the amount of $216,554.74, representing costs and attorney fees incurred since the commencement of this action. We disagree. MCR 2.114(F) provides that a party pleading a frivolous claim is subject to paying costs as a sanction. Furthermore, MCL 600.2591; MSA 27A.2591 provides that the trial court may impose a sanction on a party of paying costs and attorney fees where the action was frivolous and the party's primary purpose in initiating the action was to harass, embarrass, or injure the prevailing party. The trial court found that there was no reasonable basis for the DNR to initiate this litigation or for the allegations contained in the supporting affidavit. We agree.

The affidavit filed in support of the commencement of this litigation alleged that Bayshore was dredging, constructing new structures, and expanding its marina without a permit. Nothing in

the record indicates that these allegations were true. In fact, the department's own hearing officer at the administrative hearing concluded that no unauthorized work occurred in violation of Bayshore's permit. Furthermore, despite that administrative decision within the DNR, the department continued the instant litigation after that decision was rendered. Thus, the continuation of the litigation was frivolous.

The trial court further found that the DNR's motion for summary disposition was itself frivolous and that the DNR had failed to fully disclose the true facts underlying the basis for the motion. This relates to the DNR's claim that Bayshore's permit had expired and that a renewal application had not been submitted within seven days as required by a letter dated March 30, 1990, but not delivered to Bayshore's counsel until April 13, 1990, approximately one week after the deadline. Furthermore, there was no legal justification or authority for imposing such a deadline. The DNR refused to process the allegedly tardy application and moved for summary disposition on the basis that the operating permit had expired. In sum, the record supports the conclusion that the DNR had contrived a situation where it could claim that Bayshore failed to renew its operating permit on time and then used that nonrenewal as the basis for moving for summary disposition. In short, the trial court did not err in concluding that the motion for summary disposition was frivolous and that the DNR had failed to disclose the true facts concerning the subsequent letter denying renewal of the permit.

In addition, the trial court found that the DNR had engaged in repeated and continuing abuses of discovery. Illustrative of this is the fact that the DNR and counsel continually ignored subpoenas

seeking to depose key decision makers and to obtain documents, failed to timely seek protective orders, and ignored orders to compel discovery. Furthermore, DNR counsel made deliberate misstatements regarding the availability of relevant documents and key documents were withheld.

Finally, the DNR intentionally violated the trial court's January 4, 1990, order, requiring the DNR to process all permit applications received by Bayshore. Specifically, the DNR violated the order by use of the ruse of the failure to timely submit a renewal application and, instead of following the trial court's order, it pursued the frivolous motion for summary disposition.

In sum, the record reveals that the DNR was not seeking to litigate or resolve issues, but instead sought to punish or harass defendant for not going along with the DNR's initial requirements and by defendant's asserting its own rights. If there were any violations by Bayshore, the DNR was unable in two years of litigation to ever conclusively prove any of the alleged violations or even come close to doing so. Instead, the DNR and its counsel sought to have one of Bayshore's lawyers disqualified, petulantly refused to process permit applications (despite having been ordered to do so), ordered an administrative hearing and then ignored the decision of that hearing in Bayshore's favor, refused to comply with discovery and orders compelling discovery, and moved for summary disposition on the basis of a contrived expiration of Bayshore's operating permit.

At best, the DNR has demonstrated that there is a factual question concerning the reasonable use of the C canal, but even that point is established more by the stipulated order signed by the parties than by the facts brought forth by the department. And, in any event, the question of the reasonable

use of the C canal has become a relatively minor aspect in this litigation. Even accepting the existence of a genuine issue concerning the reasonable use of the C canal, the DNR's actions show that its primary purpose in initiating and continuing this action was to harass, embarrass, or injure Bayshore. Accordingly, we conclude that the trial court properly awarded sanctions under MCL 600.2591; MSA 27A.2591 and MCR 2.114(F).

Plaintiff also argues that the trial court erred in awarding sanctions on the basis of allegations that had been abandoned in amended pleadings. Plaintiff's argument in this respect is wholly without merit. Plaintiff argues that defendant has abandoned the claim of frivolousness because defendant's original countercomplaint alleged that the original complaint was frivolous, but that that allegation was omitted from the amended countercomplaint filed by defendant. However, requests for sanctions need not be brought in a countercomplaint, but may be raised by a motion of a party. MCL 600.2591; MSA 27A.2591. Accordingly, Bayshore was not required to raise allegations of frivolousness in the amended countercomplaint and, therefore, did not abandon that claim.

Also with respect to the sanctions issue, plaintiff argues that the trial court abused its discretion in refusing to allow plaintiff to conduct reasonable discovery relating to attorney fees and costs that defendant claimed to have incurred. We disagree. While it is true that the trial court granted a protective order in favor of defendant concerning plaintiff's discovery requests relating to the sanction issue, those discovery requests were not reasonable. The discovery requests included things such as interrogatories requesting an excessive amount of information, essentially requesting all client files for Bayshore, including files on cases

unrelated to the instant litigation, extensive personal histories of all firm employees who billed work on the file, and a listing of other clients and their accounts as well. A significant amount of the documents requested was obviously privileged, and not relevant to the limited issue whether the fees listed in the bill of particulars were reasonable. In short, the DNR once again demonstrated that its interest in this litigation was not to discover relevant information and resolve legitimate issues, but to harass and annoy defendant.

Defendant, on the other hand, had submitted extremely detailed documentation, including daily billings for and descriptions of all work performed and billed by all counsel involved in this matter, in support of its sanctions request. The documentation also detailed the monthly billings and costs from each law firm. It should be noted that DNR counsel never objected to any of the billings submitted in the bill of particulars, or sought discovery or an evidentiary hearing regarding any of the specific billings listed. In short, the trial court had correctly concluded that all of the information to which plaintiff was entitled had already been contained in the bill of particulars provided by defendant. Accordingly, the trial court did not err in granting the protective order.

Finally, plaintiff argues that the trial court erred in making use of an indexed and tabbed "summary binder" provided to the court by defense counsel. Plaintiff argues that this violated MCR 2.107(A)(1), which requires that every party must be served with a copy of every paper or pleading filed in an action. Although Bayshore's counsel provided the trial court with a summary binder used by the court throughout the proceedings, plaintiff's counsel was not provided with a copy of that binder. Defendant argues that it was

not obligated to supply plaintiff with a copy of the binder because it contained only pleadings already served on appellant's counsel. The binder was merely used to organize the trial judge's courtesy copies of those pleadings. We agree with defendant.

Plaintiff's counsel had received copies of those pleadings and, therefore, it was unnecessary to supply further copies, even though defendant chose to supply such copies to the trial court in an organized fashion to assist the court. At most, plaintiff might be able to contend that civility and professional courtesy would dictate that defendant should also have supplied such a binder to plaintiff. However, the conduct of plaintiff's counsel during the course of this litigation hardly demonstrates that plaintiff is in any position to complain about any lack of civility or courtesy on behalf of defense counsel.

For the above reasons, we affirm the decision of the trial court with the exception of its finding that the ILSA does not require marina operating permits and we remand the matter to the trial court for a determination of the sole issue whether Bayshore's use of C canal is reasonable as required by the stipulated order.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction. Defendant may tax costs.