*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

DEPARTMENT OF ENVIRONMENT, GREAT
LAKES, AND ENERGY,

UNPUBLISHED
October 22, 2020

Plaintiff-Appellee,

v

Nos. 344427; 349094
Eaton Circuit Court

BROOKSIDE CROSSING, LLC,

LC No. 2016-000624-CE

Defendant-Appellant.

Before: STEPHENS, P.J., and SAWYER and BECKERING, JJ.

PER CURIAM.

In Docket No. 344427, defendant, Brookside Crossing, LLC, appeals as of right an order assessing fines in connection with Brookside's violations of Part 31 (Water Resources Protection), MCL 324.3101 *et seq*., and Part 91 (Soil Erosion, Conservation, and Sedimentation Control), MCL 324.9101 *et seq*., of the Natural Resources and Environmental Protection Act (NREPA), MCL 324.101 *et seq*. In Docket No. 349094, Brookside appeals by leave granted an order granting a motion by plaintiff, Department of Environment, Great Lakes, and Energy (EGLE),[1] to enforce a settlement agreement. The parties had entered into the settlement agreement (SA) to resolve EGLE's requests for injunctive relief. We affirm.

## I. OVERVIEW

In 2008, Brookside began a construction project adjacent to Carrier Creek in Eaton County. The project continued in various forms for many years, and EGLE alleged that Brookside, from 2012 to 2015, violated the NREPA in several respects, although only Part 31 and Part 91 violations are directly at issue in these appeals. One aspect of the alleged Part 31 violations involved the discharge of sediment-laden water into wetlands, see MCL 324.3109, and for this reason the

---

[1] EGLE was formerly known as the Department of Environmental Quality. For consistency, we refer to the party only as EGLE in this opinion.

location of the wetlands/uplands boundary on the site was important. On cross-motions for summary disposition, the trial court ruled that the delineation performed at Brookside's request by Maynard Beery in 2006—the so-called Beery Delineation (BD)—established this boundary. However, the court allowed a bench trial with regard to whether Brookside, before the pertinent timeframe (i.e., before 2012), had converted some land to the west of this boundary to uplands.[2] Brookside takes issue with the trial court's acceptance of the BD in ruling on the cross-motions for summary disposition and with its findings after this initial phase of the bench trial.

In the second phase of the bench trial, the trial court assessed whether and when Brookside did discharge sediment-laden water into the now-definitively-delineated wetlands[3] and it also assessed the alleged violations of Part 91. There were two varieties of alleged part 91 violations— allegations that Brookside allowed sediment to leave the site and allegations that Brookside did not maintain effective soil erosion and sedimentation control (SESC) measures on the site. See MCL 324.9116. Brookside takes issue only with the latter category of allegations, arguing that the applicable statute and rules are void for vagueness.[4] Brookside also takes issue with the fines imposed for its failure to obtain an individual National Pollutant Discharge Elimination System (NPDES) permit for discharging stormwater into wetlands. See MCL 324.3112. Although Brookside originally had a so-called permit-by-rule for this discharge of stormwater, EGLE decided to require a different, individual permit in 2010, but Brookside failed to comply with EGLE's application requirements.[5] Brookside contends that EGLE lacked promulgated rules in connection with individual NPDES permits.

In the midst of the proceedings, the parties reached a settlement with regard to EGLE's requests for injunctive relief. Brookside agreed to implement a stabilization plan on the site to inhibit erosion and sedimentation. Brookside, to conduct its construction activities on the site, needed to have an additional permit—an SESC permit from the Eaton County Drain Commissioner (ECDC)—and the SA required that Brookside succeed in obtaining a valid SESC permit from the ECDC. Brookside asserted that EGLE violated the SA by interfering with its attempt to get such a permit.[6] EGLE, by contrast, contended that Brookside violated the SA by unilaterally attempting to alter the stabilization plan. Brookside challenges the trial court decision to grant EGLE's motion to enforce the SA.

## II. WETLANDS DELINEATION

As noted, the issue of the wetlands boundary was important because it impacted whether Brookside was violating Part 31 of the NREPA by discharging sediment into wetlands. See MCL

---

[2] The BD established wetlands to the west, toward Carrier Creek, and uplands to the east, toward an uphill slope.

[3] The court imposed a total of $137,500 in fines for these particular violations.

[4] The court imposed a total of $73,500 in fines for the violations of the requirement for effective SESC measures.

[5] The court imposed $12,500 in fines for the lack of an NPDES permit.

[6] Brookside had obtained earlier SESC permits, but they had expired.

324.3109. The court, in ruling on cross-motions for summary disposition, ruled that the boundary established by the BD was valid. We conclude that this ruling was proper in light of the evidence presented.

This Court reviews de novo a trial court's decision regarding a motion for summary disposition. *Spohn v Van Dyke Pub Schs*, 296 Mich App 470, 479; 822 NW2d 239 (2012). EGLE requested summary disposition under MCR 2.116(C)(10).

> A motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint. In evaluating a motion for summary disposition brought under this subsection, a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion. Where the proffered evidence fails to establish a genuine issue regarding any material fact, the moving party is entitled to judgment as a matter of law. [*Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999).]

Beery was a wetlands expert for Brookside. Importantly, the initial fill permit, issued on June 16, 2008, stated that it would expire on June 16, 2013, and indicated that Brookside could do construction activities with certain mitigation strategies related to wetlands. The permit incorporated drawings based on the BD. It is undisputed that EGLE used to use a two-factor approach for defining wetland that involved an analysis of vegetation and soils, and that it now (since 2009) uses a three-factor approach adopted by the United States Army Corps of Engineers (ACOE) that involves an analysis of vegetation, soils, and hydrology. A cornerstone of Brookside's argument on appeal is that Beery focused only on vegetation and soils and did not focus on hydrology. In essence, Brookside is arguing that although the initial permit was issued in connection with the BD, the BD is now "outdated." The record demonstrates otherwise.

Beery indicated that he looked at "[d]rainage patterns," "[s]ediment deposits," "[d]rift lines," and "[w]atermarks." The ACOE manual states, "Indicators of wetland hydrology may include, but are not necessarily limited to: drainage patterns, drift lines, sediment depositions, watermarks, . . . visual observation of saturated soils, and visual observation of inundation." Beery averred that he also considered "soil moisture," "ponding," and "flooding." As such, the evidence showed that Beery *did* consider hydrology, and Thomas Kolhoff, an EGLE employee, agreed. Brookside's argument that no evidence showed that Beery looked at all three ACOE parameters is without merit. Brookside contends that according to its later-retained expert, Edwin Martel, Beery only looked to soils and vegetation. But Martel testified that he *did not know* whether Beery used a standard that would meet "today's standard" and could not affirm that Beery did not look to hydrology.

Brookside contends that the best way to determine hydrology is by digging test wells and that only Martel did this, but the ACOE, as noted, lists various factors for determining hydrology. More importantly, Martel admitted that his "well" information was limited. EGLE's attorney attempted to get clarification from Martel about whether "the information . . . gleaned from the wells" was "limited to [2017]" or whether "you [can] tell from those wells what was going on in

-3-

2012."[7]  Martel answered, "I don't have any knowledge of what those wells would have done in those previous years except, after looking at the rain data, those were drier years."  The attorney asked, "[Y]ou can't provide any testimony as to what would have happened in those areas hydrologically from the wells of 2015, 2014, 2013, 2012?"  Martel replied in the negative.  In addition, Justin Smith, another EGLE employee, averred that he observed indicators of hydrology at the site in 2012, 2103, and 2015.  Also, while Martel asserted in a post-deposition affidavit that the wetland elevation at the site was 828 feet and that the line of an orange construction fence[8] was east and uphill of the 828 feet, he admitted that *hydrology* was the key factor at issue in delineating the wetlands and that he used his test wells to ascertain the hydrology *and* the 828-feet figure.  But, again, Martel admitted at his deposition that he could not say what his hydrology wells would have shown in 2012 through 2015.  A post-deposition affidavit may not be used to contradict earlier, damaging testimony to attempt to create a question of fact.  See *Kaufman v Payton, PC v Nikkila*, 200 Mich app 250, 256-257; 503 NW2d 728 (1993).  Moreover, a letter from one of Brookside's attorneys to EGLE, dated September 15, 2015, was admitted into evidence at the summary-disposition hearing.  The letter stated, "All the previous work was done pursuant to validly issued permits.  Before work was started years ago, *wetlands were delineated*.  The office of Eaton County should have copies of any reports and maps you need in your archives."  A party is bound by representative admissions of counsel.  *Id*. at 257.

All this evidence adequately showed that the BD was the valid wetlands boundary through 2015.  Brookside contends that at the very least, it raised, through Martel, a genuine issue of material fact regarding whether the BD line should apply.  But, as noted, Martel specifically admitted that he *did not know* what his hydrology wells would have shown in prior years.  A review of all the evidence introduced by both sides shows that EGLE demonstrated that the wetlands boundary was at the BD line and that Brookside failed to raise a genuine issue of material fact with regard to this showing.

Brookside also contends that after phase 1 of the trial, the trial court should have found that EGLE was estopped from arguing that the wetlands boundary was anywhere other than at the orange fence.  The court ruled after the first phase of the trial that the wetlands began at the BD line or the toe of the slope,[9] whichever was further west, and was not dependent on the orange fence.

This Court reviews for clear error a trial court's findings of fact after a bench trial.  *Chelsea Investment Group, LLC v Chelsea*, 288 Mich App 239, 250; 792 NW2d 781 (2010).  "A finding is clearly erroneous if there is no evidentiary support for it or if this Court is left with a definite and

---

[7] Martel did not examine the site until 2017.  The alleged violations, as noted, occurred in 2012 through 2015.

[8] The parties were debating the significance of this fence, with Brookside arguing that it marked a wetlands boundary and with EGLE arguing that it was placed *in the middle* of wetlands.

[9] " 'Toe of slope' means the point at which the side of an excavation intersects the lowest level of the excavation."  Mich Admin Code, R 408.40927.

firm conviction that a mistake has been made." *Id*. at 251. "The trial court's findings are given great deference because it is in a better position to examine the facts." *Id*.

As stated in *Lakeside Oakland Dev, LC v H & J Beef Co*, 249 Mich App 517, 527; 644 NW2d 765 (2002):

> Equitable estoppel is not an independent cause of action, but instead a doctrine that may assist a party by precluding the opposing party from asserting or denying the existence of a particular fact. Equitable estoppel may arise where (1) a party, by representations, admissions, or silence intentionally or negligently induces another party to believe facts, (2) the other party justifiably relies and acts on that belief, and (3) the other party is prejudiced if the first party is allowed to deny the existence of those facts. [Citations and quotation marks omitted.]

Kolhoff testified during phase 1 of the trial that after Brookside was issued a permit based on the BD, he made compliance inspections. He said that when he visited the site on July 9, 2008, he found that areas of BD wetlands had been disturbed and graded. Brookside agreed to put in fencing and restabilize the area as a wetlands area. Brookside installed a fence, but Kolhoff stated that it was improperly located in the middle of the BD wetlands. Kolhoff testified that EGLE decided that "because the activity was now stabilization and restoration of the site, . . . [Brookside] didn't need to move that barrier." EGLE was concerned that relocating the fence would cause additional disturbances to the land, was informed that no additional work would be performed in the area, and "felt it would be not productive . . . to move it." On September 25, 2008, and in May 2009, the fence was still in the middle of wetlands. Through 2009, EGLE determined that even though some sediment had been deposited, it "wasn't enough . . . to alter" the BD wetlands area from wetlands to uplands. In fact, Brookside pulled back some material to cause ponding in the area between construction activity and the orange fence, and the area was still wetlands. Significantly, Kolhoff testified that he met with Dan Cuthbert, Brookside's site manager, and with Brookside's attorney and specifically informed them that the orange fence was in the middle of the wetlands. He informed them that the placement of wood chips along the fence line was an unauthorized fill in a wetlands area.

Given Kolhoff's testimony—particularly his testimony that he informed Brookside about the fence being in the wetlands—the trial court did not clearly err in concluding that EGLE was not estopped from arguing that the orange fence did not represent the wetlands boundary.[10]

---

[10] We decline to review Brookside's argument about the trial court's failure to allow it to file a responsive brief. The substantive argument is made in Brookside's reply brief, but a party may not raise a new issue by way of a reply brief. *Kinder Morgan Mich, LLC v City of Jackson*, 277 Mich App 159, 174; 744 NW2d 184 (2007). In addition, Brookside has not raised the issue of the prohibition of a responsive brief in its otherwise very comprehensive statement of questions presented for appeal. In *Bouverette v Westinghouse Electric Corp*, 245 Mich App 391, 404; 628 NW2d 86 (2001), this Court stated that issues not set forth in the statements of questions presented

III. VAGUENESS—PART 91

We review Brookside's void-for-vagueness issue de novo. *Dep't of State Compliance & Rules Div v Mich Ed Ass'n-NEA*, 251 Mich App 110, 115-116; 650 NW2d 120 (2002).

MCL 324.9116 states:

> A person who owns land on which an earth change has been made that may result in or contribute to soil erosion or sedimentation of the waters of the state shall implement and maintain soil erosion and sedimentation control measures that will effectively reduce soil erosion or sedimentation from the land on which the earth change has been made.

Brookside takes issue with being fined for soil erosion and claims that the statute does not define "erosion." But the Legislature did define the term "soil erosion." " 'Soil erosion' means the wearing away of land by the action of wind, water, gravity, or a combination of wind, water, or gravity." MCL 324.9101(17).

In addition, Mich Admin Code, R 323.1709, states:

> (1) *A person shall design, construct, and complete an earth change in a manner that limits the exposed area of any disturbed land for the shortest possible period of time as determined by the county or local enforcing agency.*

> (2) A person shall remove sediment caused by accelerated soil erosion from runoff water before it leaves the site of the earth change.

> (3) *A person shall design a temporary or permanent control measure that is designed and constructed for the conveyance of water around, through, or from the earth change area to limit the water flow to a nonerosive velocity.*

> (4) *A person shall install temporary soil erosion and sedimentation control measures before or upon commencement of the earth change activity and shall maintain the measures on a daily basis.* A person shall remove temporary soil erosion and sedimentation control measures after permanent soil erosion measures are in place and the area is stabilized. A person shall stabilize the area with permanent soil erosion control measures under approved standards and specifications as prescribed by R 323.1710.

> (5) A person shall complete permanent soil erosion control measures for all slopes, channels, ditches, or any disturbed land area within 5 calendar days after final grading or the final earth change has been completed. If it is not possible to permanently stabilize a disturbed area after an earth change has been completed or

---

for appeal need not be addressed. We also decline to review certain Eighth-Amendment arguments raised by way of a reply brief. *Kinder Morgan Mich*, 277 Mich App at 174.

if significant earth change activity ceases, then a person shall maintain temporary soil erosion and sedimentation control measures until permanent soil erosion control measures are in place and the area is stabilized. [Emphases added.]

Mich Admin Code, R 323.1710, states:

*A person shall complete all temporary and permanent erosion and sedimentation control measures according to the approved plan or operating procedures.*

(1) A person shall install and maintain control measures in accordance with the standards and specifications of all of the following:

(a) The product manufacturer.

(b) The local conservation district.

(c) The department.

(d) The Michigan department of transportation.

(e) The enforcing agency, if applicable and formally adopted.

(2) If a conflict exists between the standards and specifications, then the enforcing agency or authorized public agency shall determine which specifications are appropriate for the project. [Emphasis added.]

Reading this statutory and administrative-rule language in conjunction with vagueness principles derived from caselaw leads to the conclusion that Brookside's void-for-vagueness challenge is without merit.

First, as noted by EGLE, "[t]he degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment. . . . The Court has . . . expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe."[11] *Village of Hoffman Estates v Flipside, Hoffman Estates, Inc*, 455 US 489, 498-499; 102 S Ct 1168; 71 L Ed 2d 362 (1982), reh den 456 US 950 (1982), abrogated on other grounds by *Johnson v United States*, 576 US 591; 135 S Ct 2551; 192 L Ed 3d 569 (2015).[12]

Vagueness challenges are derived from due-process principles. US Const, Am XIV; *Dep't of State Compliance*, 251 Mich App at 116. "To determine whether a statute is void for vagueness,

---

[11] There is an exception for deportation matters. See, generally, *Sessions v Dimaya*, ___ US ___; 138 S Ct 1204; 200 L Ed 2d 549 (2018).

[12] *Johnson*, 576 US at 602-603, disavowed the notion from *Village of Hoffman Estates*, 455 US at 495, that a statute can be void for vagueness only if it is vague in all of its applications.

a court should examine the entire text of the statute and give the words of the statute their ordinary meanings." *Id*. "A statute may qualify as void for vagueness if (1) it is overbroad and impinges on First Amendment freedoms, (2) it does not provide fair notice of the conduct it regulates, or (3) it gives the trier of fact unstructured and unlimited discretion in determining whether the statute has been violated." *Id*. (citations and quotation marks omitted). "[A] statute must give a person of ordinary intelligence a reasonable opportunity to know what is prohibited or required." *Id*. at 117. It must be ensured "that individuals are not held responsible by the state for conduct that they could not reasonably understand to be proscribed." *Id*. at 116. Prohibited conduct does not, however, need to be defined with "mathematical certainty." *Grievance Administrator v Fieger*, 476 Mich 231; 719 NW2d 123 (2006) (citation and quotation marks omitted).[13]

"A vagueness challenge to a statute not based on First Amendment grounds must be reviewed on the basis of the particular facts of the case at issue." *People v Lawhorn*, 320 Mich App 194, 199; 907 NW2d 832 (2017). "[A] defendant may not assert that a statute . . . reaches innocent conduct if the defendant's conduct clearly falls within the language of the statute." *Id*. A "defendant has standing to raise a vagueness challenge only if the statute is vague as applied to his conduct." *Id*. at 200 (citation and quotation marks omitted). "[E]ven if a statute may be susceptible to impermissible interpretations, reversal is not required where the statute can be narrowly construed so as to render it sufficiently definite to avoid vagueness and where the defendant's conduct falls within that prescribed by the properly construed statute." *Id*. (citation and quotation marks omitted).

The problem with Brookside's argument is that Brookside is ignoring the caselaw indicating that a vagueness challenge such as the one it is raising must be viewed in light of the facts at issue. Brookside contends that someone could be fined for failing to prevent the movement of one grain of sand or for failing to prevent soil movement during significant rain events. However, Susan Doty, an EGLE employee, again and again testified to severe violations and repeatedly stated that the Part 91 violations she observed on Brookside's site were some of the worst she had ever seen, if not the very worst. Smith spoke about "several inches of material [that] . . . had eroded into . . . the toe of slope." Moreover, Rule 323.1710 states that "a person shall complete all temporary and permanent erosion and sedimentation control measures *according to the approved plan* or operating procedures." (Emphasis added.) It is extremely significant that Brookside had an SESC permit, based on an SESC plan that it had voluntarily submitted to the ECDC, but did not operate its site in accordance with this plan. Julia Stiles, a then-employee with the ECDC, affirmed this noncompliance for 2012. And the current ECDC testified that Brookside had "come a long way[]" but was still "out of compliance." He stated that a report from October 3, 2013, showed a lot of issues on the site and that Brookside was issued an ECDC violation notice for July 10, 2015. In addition, Mich Admin Code, R 323.1709(4), indicates that SESC measures are to be maintained on a daily basis. Brookside's *own expert witness*, Cuthbert, admitted again and again to the failure to maintain SESC measures. It is also pertinent that Cuthbert admitted that

---

[13] This is contrary to Brookside's argument in its reply brief that "exact" amounts of disallowed erosion or sedimentation must be defined by statute or rule.

SESC measures always need to be site-specific and that there are no "universal set of standards which are applicable to every site for sedimentation control and/or storm water control."

While there might be a hypothetical case in which the statute and rules applicable to fines issued in conjunction with SESC measures are too vague to pass constitutional muster, this is not such a case. Brookside was well aware of the prohibited conduct and was not fined for arbitrary decisions by the enforcing agencies.

## IV. INDIVIDUAL NPDES PERMIT

Brookside's due-process challenge to the fines issued for the failure to have an individual NPDES permit is a constitutional issue subject to review de novo. See *People v McGhee*, 258 Mich App 683, 699; 672 NW2d 191 (2003).

The *sole* authority Brookside cites in support of its appellate argument about due process is *Dep't of Natural Resources v Bayshore Assoc, Inc*, 210 Mich App 71; 533 NW2d 593 (1995). In that case, this Court concluded that the Department of Natural Resources had failed to promulgate rules regarding the renewal of marina operating permits and that, therefore, denying such a permit would be a denial of due process. *Id*. at 83-85. The present case is not comparable.

MCL 324.3112(1) states that "[a] person shall not discharge any waste or waste effluent into the waters of this state unless the person is in possession of a valid permit from" EGLE.[14] "Waste" includes "[d]redged spoil" and "sand." Mich Admin Code, R 323.2104(aa)(*i*) and (*xiv*). "Wastewater" involves the discharge of liquid waste. Mich Admin Code, R 323.2104(bb). A "state permit" is "a permit or equivalent document or requirements that are issued by the department to a discharger who discharges wastewater on the ground or into groundwaters." Mich Admin Code, R 323.2104(s). A "national permit" is "an NPDES permit, or equivalent document or requirements, issued by" EGLE for discharges into surface waters. Mich Admin Code, R 323.2103(p). The parties do not dispute that surface waters include wetlands. See Mich Admin Code, R 323.1044(u)(*vii*). Mich Admin Code, R 323.2161(b), specifically indicates that a national permit is to be sought for pertinent stormwater discharges from construction activity that disturbs five acres or more. Mich Admin Code, R 323.2190(1), indicates that an automatic permit-by-rule will exist if certain delineated conditions exist in connection with construction activity. For example, for construction activity that is undertaken by a private entity and that involves more than five acres, the permittee must file a notice of coverage that includes a valid SESC permit. Mich Admin Code, R 323.2190(1)(a)(*i*). However, this permit-by-rule is not applicable if EGLE "has required an individual national permit pursuant to the provisions of subrule (3) or (4) of this rule[.]" Mich Admin Code, R 323.2190(1). Rule 323.2190 states, in part:

> (3) The department may require that discharges from a construction activity be authorized by an individual national permit if it has been determined by the department that unlawful pollution cannot be adequately guarded against, and there

---

[14] An amendment of this statute in 2018 did not affect the language at issue. 2018 PA 667.

is or may be water quality degradation that will violate the commission act[15] unless requirements in addition to those in the soil erosion and sedimentation control permit are imposed. A determination by the department for an individual national permit or other additional control constitutes grounds for revocation of the authorization to discharge pursuant to the provisions of this rule.

(4) The department may require that discharges from a construction activity be authorized by an individual national permit if it has been determined by the department that the responsible part 91 permitting entity or authorized public agency is not carrying out a program that is adequate to ensure that the requirements of part 91 of the act are complied with.

Clearly, EGLE has the authority to request an individual NPDES permit.

In addition, there are rules in place regarding the application for such a permit. Mich Admin Code, R 323.2108(1), indicates that an application for a wastewater discharge permit "shall be completed in accordance with and subject to guidelines in 40 C.F.R. §122.21 (2005)," which deals with requirements for NPDES permit applications. An individual NPDES permit falls under the broad umbrella of a wastewater-discharge permit. In addition, Mich Admin Code, R 323.2189(2)(d), adopts 40 CFR 122.26 (2000). 40 CFR 122.26 (2000) includes a description of needed information for permitting, in general, for construction projects. See 40 CFR 122.26(c)(1)(*ii*) (2000), 40 CFR 122.26(b)(14)(*x*) (2000), and 40 CFR 122.26(b)(15) (2000). Also, and significantly, 40 CFR 122.26(c)(1) (2000) speaks specifically about *individual* permits needing to conform to 40 CFR 122.21. Brookside is mistaken in arguing that no rules were in place regarding the application for an individual permit. Brookside contends that at trial, Doty could not identify the applicable rules, but Doty is not a lawyer. The present case is simply not analogous to the *Bayshore* case because applicable rules existed.

EGLE informed Brookside of the information needed for its application. Brookside appears to be arguing that EGLE acted arbitrarily in requesting certain specific information in connection with the application for an individual permit. We note, however, that a "general permit" is "a national permit issued authorizing a category of similar discharges." Mich Admin Code, R 323.2103(a). By contrast, MCL 324.3118, dealing with fees for stormwater discharge permits, states that an "individual permit" is a "site-specific permit." MCL 324.3118(13)(g). In addition, Mich Admin Code, R 323.2112, states:

(1) The department, at its discretion or upon request of the regional administrator, may request of an applicant any additional information deemed necessary to complete or correct deficiencies in the application before processing the application or issuing or denying the issuance of a permit. *A national permit or state permit shall not be issued by the department until an application is complete or any further information requested by the department is supplied.*

---

[15] This is evidently a reference to the predecessor of the NREPA.

(2) The department shall take proper enforcement action as prescribed by part 31 of the act against any person who fails to file a complete application, if deficiencies are not corrected or incomplete information is not supplied within 60 days to the department following its request by the applicant. [Emphases added.]

In light of the site-specific nature of an individual permit and in light of Rule 323.2112, EGLE was within its rights to request additional information from Brookside. Brookside seems to be implying that EGLE must have a rule designating *exactly* what information must be supplied in applications for individual permits, but this makes no practical sense in light of the site-specific nature of individual permits.

As for the second part of Brookside's argument—that there were no rules for governing when an individual permit would be issued or denied—this issue is not ripe for appellate review. EGLE *never decided* whether to issue the individual permit because Brookside failed to supply the requested information. The ripeness doctrine prevents review of a hypothetical claim before an actual injury occurs. *People v Robar*, 321 Mich App 106, 128; 910 NW2d 328 (2017). This Court would only be able to guess whether EGLE, had it received the requested information from Brookside, would have denied the individual permit and on what basis.[16]

## V. ENFORCEMENT OF SETTLEMENT AGREEMENT

Brookside contends that EGLE's motion to enforce the SA was being adjudicated as a motion for summary disposition and that the court improperly failed to view the evidence in the light most favorable to Brookside and improperly failed to set the matter for a full evidentiary hearing. The entire premise of Brookside's argument is faulty, however, because EGLE's motion was not a motion for summary disposition. The motion filed by EGLE on which the trial court was ruling was a motion to enforce the SA. In approving the settlement agreement, the court had stated, in part:

> 3. The [c]ourt retains jurisdiction to enforce the Settlement Agreement; any request for enforcement . . . may be brought by post-judgment motion, properly filed, briefed and noticed in accordance with MCR 2.116, as if Motions for Summary Disposition[.]

And at the motion hearing regarding enforcement of the SA, the court stated:

> This is the date and time set for the plaintiff's motion to enforce the settlement agreement. Now, I should note that there have been other pleadings filed. The pleadings that have been filed are not in compliance with the [c]ourt's order. However, the—I do have and am considering the response by Brookside on how to—the response to the motion to enforce. There was [sic] other motions that have been filed, and there have been, I think, even responses.

---

[16] We note, at any rate, that Rule 323.2190 provides guidance regarding the ends to be achieved with the individual permit.

I was very clear in my terms of how motions were to be treated. The [c]ourt has the discretion to do that. And the reason I exercise my discretion in this case is because this is a complicated, factual subject matter. It is also a subject matter that's not dealt with on a routine basis. *So, in order for the Court to be fully prepared, I impose the time limits pursuant to MCR 2.116*, which are the time limits for the motion [sic] for summary disposition. That . . . was in my order of . . . December 1st, where the [c]ourt specifically said that any motions to . . . enforce the agreement needed to comply with the time restrictions for the motion [sic] for summary disposition.

It is clear from the record that the court was imposing the *time limits* applicable to motions for summary disposition, not ordering that motions to enforce the SA would be *adjudicated* as motions for summary disposition. And indeed, *the parties did not file briefs styled as motions for summary disposition*. Brookside points out that the court, at one point during the motion hearing, referred to a genuine issue of fact. The court stated, "If you felt [certain] affidavits were false, you should have gotten a competing affidavit, and then we would have a genuine issue of fact." This bare statement by the court did not somehow transform EGLE's motion to enforce the SA into a motion for summary disposition. Neither the court's ultimate oral ruling nor its written order referred to the standards for a summary-disposition motion. It is evident from the transcript as a whole that the hearing on May 3, 2019, was the very evidentiary hearing that Brookside now claims was required and that the trial court was ruling whether to grant EGLE's motion to enforce the SA on the basis of the evidence presented.

The upshot is that Brookside's primary argument on appeal is inapposite. The court's decision, at any rate, was adequately supported by the evidence. A trial court's decision to enforce a settlement agreement is reviewed for an abuse of discretion, see *Groulx v Carlson*, 176 Mich App 484, 493; 440 NW2d 644 (1989), and a trial court's factual findings are reviewed for clear error, *King v Michigan*, 488 Mich 208, 213; 793 NW2d 673 (2010). The court's decision to grant EGLE's motion was not an abuse of discretion and its factual findings were not clearly erroneous.

Brookside argues that EGLE's motion should not have been granted because EGLE interfered with SESC permitting and breached the SA when Doty responded to a request by Jessica Larkin, an ECDC employee, for assistance by raising some issues with regard to Part 91 compliance. The trial court disagreed that this constituted a breach of the SA and found the argument "totally without merit."

The SA provided, in part:

> 4. The parties desire to resolve [EGLE's] remaining claims for injunctive relief, and hereby agree that the terms of this Agreement are appropriate and adequately address the environmental concerns at the Site requiring injunctive relief.
>
> * * *
>
> 6. Brookside agrees to commence implementation of the 2017 Stabilization Plan designed by its engineers, Wolverine Engineers and Surveyors, Inc., not later

than thirty (30) days after the issuance of the Required Permits referenced in paragraph 7, below. . . . [EGLE] agrees to the 2017 Stabilization Plan, and agrees to take no action to hinder, delay or prevent Brookside from completing the 2017 Stabilization Plan. . . . In consideration of the agreement to implement the 2017 Stabilization Plan and to resolve the injunctive issues in this litigation, [EGLE] agrees to conduct inspections of the ongoing 2017 Stabilization Plan work not more than twice per month, and shall provide at least 24 hours email notice . . . .

7. *This Agreement is contingent upon the issuance of necessary Part 91 SESC permits that must be approved by the [ECDC] . . . . Brookside will within twenty (20) days of the effective date of this Agreement submit a good faith* application, *meeting legal requirements for such SESC permits to the ECDC . . . .* [EGLE] . . . agrees to take no action to persuade or cause that any other parties require Brookside to obtain additional permits . . . .

8. Brookside agrees to permanently stabilize the Site within one (1) year of the issuance of all of the Required Permits. . . .

9. Once Brookside properly completes all items required by the 2017 Stabilization Plan, it will be entitled to have [EGLE] "close out" the Site. . . .

10. Brookside will refrain from the deposition of any additional material that would elevate the identified final grade, except as provided in the 2017 Stabilization Plan, or non-material changes as reasonably approved by the ECDC. *[EGLE] agrees it will not unduly attempt to influence or interfere with the ECDC's issuance and/or administration of the Part 91 SESC permit referenced in this Agreement. The parties expressly acknowledge that, by law, [EGLE] oversees the ECDC as a county enforcement agency under Part 91 of the NREPA. As such, the parties acknowledge that the agencies communicate with one another as a practical matter of course of this regulatory oversight.*

\* \* \*

18. This Agreement in no way waives Brookside's responsibility to comply with any other state or local laws and regulatory requirements associated with its construction activities at the Site, other than those which are the subject of this Agreement or were the subject of the lawsuit by [EGLE] . . . . [Emphases added.]

The SA expressly contemplated that the application for an SESC permit needed to meet all legal requirements for such a permit. Importantly, Brookside itself admits that even though it submitted the stabilization plan derived from the SA to the ECDC in January 2018, the ECDC, *before any contact with Doty*, required changes to the plan. Indeed, Larkin averred that the SESC plan submitted with the January 8, 2018 application was deficient because it mislabeled certain drains as county drains and because the ECDC was requiring more mulch blankets. Brookside did not and does not take issue with this initial denial of the application. The importance of this sequence of events is that Brookside itself acknowledges that the ECDC could exercise its authority to determine whether the plan submitted with the permit application was sufficient under

applicable laws—and it found it insufficient before any feedback from Doty. The ECDC was not bound to accept the stabilization plan from the SA and automatically issue an SESC permit after viewing the plan.[17]

Larkin averred that in May 2018, the ECDC again found deficiencies and only then asked for feedback from EGLE. As noted, the SA stated that EGLE "will not unduly attempt to influence or interfere with the ECDC's issuance and/or administration of the Part 91 SESC permit referenced in this Agreement." But it immediately went on to state, "The parties expressly acknowledge that, by law, [EGLE] oversees the ECDC as a county enforcement agency under Part 91 of the NREPA. As such, the parties acknowledge that the agencies communicate with one another as a practical matter of course of this regulatory oversight." That Doty gave opinions about Part 91 compliance in response to a direct request for regulatory oversight from the ECDC does not clearly evidence an attempt to unduly interfere with the issuance of a permit, when viewed in light of Larkin's and another ECDC employee's express indications that the subsequent denial of the permit was based on noncompliance with applicable law, and in light of the SA's requirement that Part 91 compliance was necessary. In the review sheet she issued to Larkin, Doty used a one-page, standard form addressing Part 91 and the relevant requirements set forth in Mich Admin Code, R 323.1703; she used matter-of-fact language about possible areas of noncompliance; many of her comments were actually questions, or were related to merely needing more written explanations on the plan; and she did not give any indication that she wished for the ECDC to deny the SESC permit.[18] In addition, it is not disputed that Brookside thereafter attempted to implement various changes on the site that were materially *not* in conformance with the SA, such as the addition of sediment ponds. Given all these circumstances, the court did not abuse its discretion or commit clear error[19] by finding that EGLE did not breach the SA and by ordering that the SA be enforced. EGLE agreed to settle the claims for injunctive relief and agreed to a stabilization plan that it found acceptable, but it also could not ignore its obligation to exercise some amount of Part 91 regulatory oversight as requested by the ECDC. Instead of simply implementing the changes requested by the ECDC[20] in order to obtain a valid permit in connection with the agreed-upon stabilization plan, Brookside ended up attempting to alter, unilaterally, material aspects of the stabilization plan.

Brookside places considerable emphasis on two e-mails, one from the ECDC attorney and one from Larkin, and argues that the trial court erroneously failed to take them into consideration. However, all Larkin said in her e-mail was that she was attaching the review sheet from Doty—

---

[17] And contrary to Brookside's implication, that the court referred to the SA as conforming with applicable law does not mean that Part 91 was fully complied with by virtue of the stabilization plan. Once again, the SA itself contemplated that the ECDC might have additional legal requirements.

[18] The later denial letter—which was issued after an independent review by an outside contractor—included issues beyond those identified by Doty.

[19] The standards of review must be kept in mind. In other words, the court's conclusions are accorded a certain amount of deference.

[20] As noted by EGLE, the requested changes did not require a change in the scope of Brookside's work.

-14-

and the trial court *considered* this review sheet and found that it was an example of EGLE's allowed oversight powers as contemplated by the SA. Larkin's e-mail adds nothing to the existing evidence. The ECDC attorney stated in her e-mail: "It is my understanding that the plans were never approved by the Drain Commission. The person at [EGLE] that has raised issues with the plan is Susan Doty. I am asking that Jessica Larkin forward to you her comment sheet." Once again, the trial court was *well aware* that Doty had submitted a comment sheet to Larkin. It is unclear why Brookside is placing so much importance on these e-mails when they simply do not add anything to the evidence presented. The court concluded that Doty, in the course of regulatory oversight, made some comments in response to Larkin's request, that the permit was denied because of Brookside's failure to comply with applicable law, and that Doty did not act in bad faith or breach the SA. The court acted within its discretion in reaching this conclusion, and its factual findings were not clearly erroneous in light of the record.

Brookside contends that the court should not have granted EGLE's motion because EGLE had unclean hands. The doctrine of unclean hands indicates that equity will not be granted to "one tainted with inequitableness or bad faith relative to the matter in which he seeks relief[.]" *McFerren v B & B Investment Group*, 253 Mich App 517, 522; 655 NW2d 779 (2002) (quotation marks and citations omitted). Although a court's factual findings are reviewed for clear error, matters of equity are reviewed de novo. See *McDonald v Farm Bureau Ins Co*, 480 Mich 191, 197; 747 NW2d 811 (2008).

Brookside contends that Doty interfered with the ECDC permitting process and that even if the breach of contract by Doty were to be deemed minor, it nevertheless amounted to unclean hands on the part of EGLE. However, the trial court found that the claim of breach was "*totally without merit*," and as discussed, the court did not err by making this finding. In addition, even assuming, arguendo, that EGLE breached the SA, it is simply not in dispute that *Brookside breached the SA first* by missing, by approximately 18 days, the deadline in the SA for submitting an SESC permit application. As stated in *Attorney General v PowerPick Club*, 287 Mich App 13, 53; 783 NW2d 515 (2010), "[a] defendant with unclean hands may not defend on the ground that the plaintiff has unclean hands as well." Brookside, as noted, *concedes* that even minor breaches are enough to dirty a litigant's hands.[21] In light of *PowerPick Club*, the trial court properly rejected Brookside's unclean-hands argument.

We affirm in both appeals.

/s/ Cynthia Diane Stephens
/s/ David H. Sawyer
/s/ Jane M. Beckering

---

[21] Moreover, it is not apparent that this breach was minor, given Brookside's continual and ongoing Part 91 violations. As noted by the trial court, it was another sign of Brookside's continual evasion of its obligations.